**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-----------------------------x
                             :
UNITED STATES OF AMERICA      :    No. 3:21CR00192(SALM)
                             :
v.                            :
                             :
NAMIR WALKER                  :    June 17, 2022
                             :
-----------------------------x
```

<u>**RULING ON DEFENDANT'S MOTION TO SUPPRESS**</u>
<u>**PHYSICAL EVIDENCE (DOC. #38)**</u>

Defendant Namir Walker ("Walker" or "defendant") has filed a motion "to suppress evidence obtained in violation of the Fourth Amendment to the U.S. Constitution, specifically, a small quantify of crack cocaine, and fentanyl." Doc. #38 at 1 (sic). The United States of America (the "government") has filed a memorandum in opposition to the motion. <u>See</u> Doc. #43. The Court heard oral argument on the motion on April 28, 2022. <u>See</u> Doc. #53. For the reasons stated herein, defendant's Motion to Suppress Physical Evidence [**Doc. #38**] is **DENIED**.

## I.   <u>Background</u>

Defendant is charged in a two-count Indictment with: (1) Possession with Intent to Distribute a detectable amount of fentanyl and a detectable amount of cocaine base, in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(C); and (2) Possession of a Firearm in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. §924(c)(1)(A)(i). <u>See</u> Doc. #11.

Defendant moves to suppress evidence that was "seized from the defendant's person and in proximity to the defendant upon his arrest by the East Hartford police in the parking lot at Glenn Road, East Hartford, on the evening of October 26, 2021." Doc. #38 at 1.

The following facts are derived from the exhibits attached to the parties' submissions.[1]

Defendant has submitted an exhibit titled "Relevant Portions of ATF Affidavit of November 3, 2021, in Support of Search of Defendant's Residence and Cell Phone[.]" Doc. #39-1 at 1. That affidavit states, in part:

> [O]n October 26, 2021, members of DEA Hartford Resident Office Task Force received information from a known and reliable Hartford Police Department Confidential Source (CS) that a tall, light skinned black male from East Hartford, later identified as Namir WALKER, had a gun and drugs in his possession in a vehicle. The CS stated that the male was in the parking lot of 61 Glenn Road in East Hartford with female and another party. Members of the task force entered the parking lot and immediately observed a vehicle with three occupants. ... [T]he backseat passenger appeared to match the description provided by the CS.

Doc. #39-1 at 3 (sic).

When the officers arrived at the parking lot, four officers

---

[1] The parties have submitted a Joint Exhibit "consisting of body worn camera footage[.]" Doc. #48 at 1. The exhibit contains "two videos (from two different police officers)[.]" Id. Throughout this Ruling, the Court refers to the video taken by a female police officer's body camera as "Video One." The video taken by a male police officer's body camera is referred to as "Video Two" throughout the Ruling.

approached the vehicle. See Video One, 0:25-0:39; see also Video Two, 0:33-0:41. A female officer approached the driver's side of the vehicle, with two male officers standing behind her, and one male officer standing on the passenger side of the vehicle. See id. As she walked towards the driver side of the vehicle, the female officer stated: "Alright, let me see your hands. Hands. Everybody hands up." Video One, 0:28-0:32. The female officer asked: "How you guys doing?" Id. at 0:32-0:33. The occupant seated in the driver's seat responded: "Good." Id. at 0:33-0:34. The female officer informed the vehicle's occupants that "we got called because of you guys being parked out here for a long time, okay. Somebody called, found it weird that three people were just parked here. Kind of awkward, okay." Id. at 0:40-0:48. The female officer asked the vehicle's occupants: "Do you guys live here?" Id. at 0:48-0:49. The defendant, who was seated in the rear passenger seat of the vehicle, responded: "No we're waiting for our boy. He lives here." Id. at 0:50-0:51.

The female officer responded: "Just keep your hands up my man, alright, you guys got IDs on you?" Id. at 0:52-0:55. One of the vehicle's occupants replied, "no, I don't got no ID[.]" Id. at 0:55-0:56. Thereafter, the female officer stated: "Alright, as a matter of fact, I'm gonna have you hop out real quick sir, if you could just hop out, keep your hands up, we're gonna pat you guys down." Id. at 0:56-1:03. At this time, one of the male

officers that was standing on the driver's side of the vehicle, walked to the front passenger side of the vehicle, where he remained standing. See Video Two, 0:57-1:01.

The female officer asked the vehicle's driver "you got the keys to the, give me the keys to the car." Video One, 1:05-1:07. The vehicle's driver moved his right hand out of sight of the female officer's body camera. See id. at 1:08-1:12. The female officer then grabbed the vehicle's driver by the shoulder with her left hand, and said: "Hey, give me the keys." See id. at 1:12-1:13. The driver responded: "Oh no, I'm sorry, I'm sorry," and handed the female officer what appeared to be the keys to the vehicle. See id. at 1:13-1:14. The female officer stated: "What the hell are you doing, you keep your hands up." Id. at 1:16-1:19. Immediately thereafter, a different officer began to open the driver's door of the vehicle, and the female officer said "step out." Id. at 1:21-1:25.

As the driver exited the vehicle, the government asserts that "a crack pipe fell to the ground." Doc. #43 at 2-3.[2] Thereafter, the female officer stated to the driver: "What you

---

[2] While an object can be heard falling in the video as the driver exits the vehicle, Video One, 1:24, the video does not show, and the ATF Affidavit does not reflect, what fell to the ground when the driver exited the car. However, this question does not affect the Court's analysis; the officers used the least intrusive means reasonably available to effectuate the officers' legitimate investigative purposes regardless of whether they were aware of the presence of drug paraphernalia at the time.

got there, turn around, turn around, turn around." Video One,
1:25-1:28. The driver complied, and a different officer began to
pull the driver's hands behind his back. See id. at 1:29-1:36.

Moments before the driver exited the vehicle, a male
officer opened the rear passenger door and directed defendant to
"step out, keep your hands up." Video Two, 1:17-1:20. At that
time, defendant stepped out of the vehicle, holding a cell phone
in his left hand. See id. at 1:19-1:20. As defendant exited the
vehicle, an officer stated: "slow, slow, slow, turn, turn, turn,
put your hands out and touch the car," while a different officer
guided defendant to face the vehicle. Id. at 1:20-1:23.
Defendant placed his cell phone in his right hand, and began
reaching back into the vehicle with his left hand, but was
immediately grabbed by two male officers. See id. at 1:24-1:27.
The officer who was preparing to pat down Walker said "don't
reach in, don't reach in." Id. at 1:25-1:26. The phone is then
visible in Walker's left hand. Id. at 1:25-1:29. Defendant
replied, "can I get my phone, can I get my phone please?" Id. at
1:27-1:28. The officers held the defendant, and a male officer
stated "no, no, no, no, no ... hang tight." Id. at 1:28-1:31.
The female officer then approached the defendant, began to grab
his left wrist, and stated "we're just gonna put you in
handcuffs real quick." Id. at 1:32-1:36. Defendant responded:
"[A]m I being detained, am I being detained," to which the

female officer replied "yes, you are, you are being detained."
Video One, 1:37-1:40.

Defendant then "began to struggle and fight with
officers[.]" Doc. #39-1 at 3.

> During the struggle, one of [defendant's] cell phones
> and packaged suspected fentanyl fell from somewhere on
> his person and was recovered by officers in the path of
> their struggle. Once [defendant] was secured he was
> taken into custody and searched incident to his arrest:
> during that search, officers found a plastic bag
> containing suspected crack cocaine in his sock.

Id. at 4.

"In plain view on the backseat floor of the vehicle, where
[defendant] had been sitting ... officers observed a loaded
pistol." Id. "Officers then conducted a search of the rear of
the vehicle and located a jacket. A search of the jacket
revealed that it contained additional bags with suspected
fentanyl." Id.

Defendant now moves "to suppress evidence obtained in
violation of the Fourth Amendment to the U.S. Constitution,
specifically, a small quantify of crack cocaine, and fentanyl."
Doc. #38 at 1 (sic). Defendant does not move to suppress the
firearm that was found in the vehicle following his arrest.

For the reasons set forth herein, defendant's motion is
**DENIED.**

## II.  Legal Standard

"The Fourth Amendment protects the 'right of the people to

be secure in their persons, houses, papers, and effects, against
unreasonable searches and seizures.'" United States v.
Bershchansky, 788 F.3d 102, 110 (2d Cir. 2015) (quoting U.S.
Const. amend. IV). "As the text makes clear, 'the ultimate
touchstone of the Fourth Amendment is reasonableness.'" Riley v.
California, 573 U.S. 373, 381 (2014) (quoting Brigham City v.
Stuart, 547 U.S. 398, 403 (2006)). "In most cases,
reasonableness requires ... probable cause." United States v.
Lifshitz, 369 F.3d 173, 178 (2d Cir. 2004).

There are, however, "exceptions to the probable cause
requirement." United States v. Suggs, No. 3:20CR00150(KAD), 2021
WL 1601120, at *3 (D. Conn. Apr. 23, 2021). As relevant here,
"police may briefly detain an individual for questioning if they
have a reasonable suspicion that criminal activity is afoot, and
may frisk him if they reasonably believe he is armed and
dangerous." United States v. Elmore, 482 F.3d 172, 178 (2d Cir.
2007) (citing Terry v. Ohio, 392 U.S. 1 (1968)). This is
commonly referred to as a "Terry stop." "Reasonable suspicion
requires more than an 'inchoate and unparticularized suspicion
or hunch.'" Id. (quoting Alabama v. White, 496 U.S. 325, 329
(1990)). Officers instead "must be able to point to specific and
articulable facts which, taken together with rational inferences
from those facts, reasonably warrant the intrusion on a
citizen's liberty interest." Id. at 178-79 (citation and

quotation marks omitted). "In assessing the reasonableness of an officer's suspicion, [the Court] must take into account 'the totality of the circumstances' and must 'evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his [or her] experience and training.'" United States v. Compton, 830 F.3d 55, 61 (2d Cir. 2016) (quoting United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000)).

The Fourth Amendment's reasonableness standard "governs not just the fact of the Terry stop but its scope." United States v. McCargo, 464 F.3d 192, 198 (2d Cir. 2006). "Courts assess 'reasonableness' in this context by 'balancing the particular need to search or seize against the privacy interests invaded by such action.'" United States v. Fiseku, 915 F.3d 863, 870 (2d Cir. 2018) (quoting United States v. Bailey, 743 F.3d 322, 331 (2d Cir. 2014)).

Thus, for a Terry stop to be "conducted in an appropriate manner, not only must it be no longer in duration than necessary to confirm or dispel officers' reasonable suspicions; the stop must also employ 'the least intrusive means reasonably available to effect ... legitimate investigative purposes.'" United States v. Patterson, 25 F.4th 123, 141 (2d Cir. 2022) (quoting United States v. Newton, 369 F.3d 659, 674 (2d Cir. 2004)).

A Terry stop must, therefore, be "limited to the degree of

intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place." Grice v. McVeigh, 873 F.3d 162, 167 (2d Cir. 2017). A stop "requiring reasonable suspicion may ripen into a de facto arrest requiring probable cause 'if the means of detention are more intrusive than necessary.'" Hawthorne ex rel. Hawthorne v. Cty. of Putnam, 492 F. Supp. 3d 281, 295 (S.D.N.Y. 2020) (quoting United States v. Tehrani, 49 F.3d 54, 61 (2d Cir. 1995)).

> At the same time, however, the law recognizes the "important need to allow authorities to graduate their responses to the demands of any particular situation." United States v. Sharpe, 470 U.S. 675, 686 (1985) (internal quotation marks omitted). Thus, where an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take "necessary measures ... to neutralize the threat" without converting a reasonable stop into a de facto arrest. Terry, 392 U.S. at 24[.]

Newton, 369 F.3d at 674.

## III. Discussion

Defendant asserted in his motion that the officers' "actions collectively amount to an arrest for which probable cause was lacking." Doc. #39 at 3. The government responded that "[t]he defendant mischaracterizes an investigative stop as an arrest and as such, the proper analysis is not whether the police had probable cause to arrest him, but rather, is whether they had reasonable suspicion to stop him." Doc. #43 at 5. The government further contended that the Terry stop was not

transformed into a de facto arrest when the defendant "was asked to exit the vehicle and officers moved to put him in handcuffs[.]" Id. at 9.

At oral argument, defendant conceded that the officers had reasonable suspicion to stop him when they approached the vehicle.[3] Furthermore, defendant conceded at oral argument that the officers developed probable cause to arrest him when he resisted the officers' attempts to handcuff him and engaged in a physical struggle with officers. See Doc. #39 at 2. Thus, the question that remains for the Court is whether the Terry stop was transformed into a de facto arrest when the officers directed the defendant to exit the vehicle and attempted to handcuff him. The Court finds that it was not.

> When a court considers a claim of de facto arrest, the following facts are generally deemed relevant: (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons.

Fiseku, 915 F.3d at 870 (citation and quotation marks omitted). "'No one of these factors is determinative. But to satisfy the reasonableness standard, officers conducting stops on less than

---

[3] The undersigned has reviewed the recording of the April 28, 2022, oral argument to confirm her recollection of the arguments made. Neither party has ordered an official transcript.

probable cause must employ the least intrusive means reasonably available to effect their legitimate investigative purposes.'" Id. (quoting Newton, 369 F.3d at 674). Weighing these factors, the Court finds that defendant's encounter with the officers did not become a de facto arrest requiring probable cause when the officers directed defendant to exit the vehicle and attempted to handcuff him.

### A.   Duration of the Stop

This factor weighs in favor of finding that the Terry stop did not become a de facto arrest before the officers developed probable cause. "While the Supreme Court has declined to establish a bright-line rule for the permissible duration of an investigative Terry-type detention, it is clear that a valid detention 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" Crismale v. Reilly, No. 3:13CV00470(JAM), 2014 WL 3738151, at *4 (D. Conn. July 29, 2014) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). "In assessing whether a detention is too long or intrusive to be justified as an investigative stop, courts properly examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Bailey, 743 F.3d at 336 (citation and quotation marks omitted). "[I]n cases where law enforcement officers have conducted their investigations without needless

delay, numerous courts have found investigative detentions of fairly substantial length -- anywhere from thirty minutes to nearly three hours -- to be constitutionally reasonable." Crismale, 2014 WL 3738151, at *4. "The relevant time span [when assessing a Terry stop's duration] is between the initial stop ... and the ... point probable cause justifying an arrest undisputedly exist[s]." United States v. Fiseku, No. 15CR00384(PAE), 2015 WL 7871038, at *11 (S.D.N.Y. Dec. 3, 2015), aff'd, 906 F.3d 65 (2d Cir. 2018), and aff'd, 915 F.3d 863 (2d Cir. 2018).

The Terry stop in this case lasted for only a very brief time. Upon approaching the parked vehicle, the officers spoke with its occupants for approximately one minute before defendant stepped out of the vehicle. See Video One, 0:30-1:22; Video Two, 0:31-1:21. Less than thirty seconds after he exited the vehicle, defendant resisted the officers' attempts to conduct a pat-down, and to prevent him from reaching into the car, and a struggle ensued, at which point defendant concedes that the officers developed probable cause to place him under arrest. See Video Two, 1:19-1:41.

Thus, in total, the Terry stop lasted for less than two minutes, at the very most. "An investigatory stop of this duration plainly falls within the bounds [the Second Circuit] has deemed reasonable." Patterson, 25 F.4th at 141; see also

Newton, 369 F.3d at 675 ("The record indicates that his seizure was certainly brief, lasting only the few minutes it took the officers to locate the sought-for firearm, after which [defendant] was formally arrested."); United States v. Forero-Rincon, 626 F.2d 218, 224 (2d Cir. 1980) (holding that Terry stop was "minimally intrusive" where it "lasted only five to ten minutes"); Fiseku, 2015 WL 7871038, at *11 ("The Court finds the 10-minute detention reasonable here under the circumstances, as it enabled the officers to efficiently investigate whether a crime was in progress."). "There is no claim or evidence that the officers failed to diligently investigate the scene of the detention[.]" United States v. Torres-Miranda, No. 3:19CR00120(VLB), 2021 WL 77096, at *10 (D. Conn. Jan. 8, 2021). Accordingly, this factor weighs in favor of finding that the Terry stop did not ripen into a de facto arrest before the officers developed probable cause.

### B.   Public or Private Setting

The Second Circuit has identified a Terry stop's "public or private setting" as a relevant factor in determining whether probable cause was required to continue the detention. Newton, 369 F.3d at 674. Courts within this Circuit have interpreted this factor in different ways. Most courts have held that "[a] stop that occurs in a public setting is less likely to rise to the level of a formal arrest than an encounter that occurs in a

private setting." United States v. Rivera, No. 3:07CR00285(EBB),
2008 WL 2229917, at *7 (D. Conn. May 28, 2008), aff'd, 353 F.
App'x 535 (2d Cir. 2009). However, at least one court within
this Circuit has held that the "largely private nature of the
detention weighs in favor of a conclusion that the detention was
an investigatory stop, and a reasonable one." Rivera v. Trinh,
No. 3:19CV01257(MPS), 2021 WL 3742240, at *4 (D. Conn. Aug. 24,
2021).

Competing interests apply when considering whether law
enforcement officers require probable cause, rather than
reasonable suspicion, to detain a person in a public versus a
private setting. The Second Circuit has observed that when a
stop occurs in a private setting, the detainee is "subjected to
neither the inconvenience nor the indignity associated with a
compelled visit to the police station." Newton, 369 F.3d at 675
(citation and quotation marks omitted). However, in a public
setting, officers frequently "lack[] effective control over
their surroundings[.]" Fiseku, 2015 WL 7871038, at *10. As a
result, such a setting often heightens the potential risk to
"officer and public safety[,]" thereby requiring officers to
take additional protective measures when effectuating a Terry
stop. Patterson, 25 F.4th at 135; cf. Forero-Rincon, 626 F.2d at
224 (Investigatory stop was "entirely reasonable[,]" in part
because it "occurred in a public place."); United States v.

Zapata, 18 F.3d 971, 975 (1st Cir. 1994) (finding a detention to be a Terry stop rather than a de facto arrest where "[t]he encounter occurred in a public place[]"); United States v. Wilson, No. 14CR00209(LDD), 2016 WL 11642732, at *8 (E.D. Pa. Oct. 27, 2016), aff'd, 960 F.3d 136 (3d Cir. 2020) (Detention did not constitute de facto arrest: "The questioning did not occur at a stationhouse or other private location; instead, Wilson was questioned in a car on the side of a public road.").

The encounter between law enforcement and Walker was in a public setting; such a setting can present a heightened risk to officer and public safety. Before approaching the vehicle, the officers had received information that a person matching defendant's description "had a gun and drugs in his possession[.]" Doc. #39-1 at 3. Such facts "sensibly heightened the officers' concern for their own safety and that of the public," because the encounter occurred in a residential "parking lot in which other vehicles were parked." United States v. Redick, No. 3:05CR00168(MRK), 2006 WL 908153, at *6 (D. Conn. Apr. 5, 2006); see also Video Two, 0:31.[4] In light of that heightened concern, it was reasonable for the officers to

---

[4] The affidavit attached to the motion indicates that there was only one vehicle in the parking lot. See Doc. #39-1 at 3. However, the video evidence shows multiple vehicles in the parking lot, see Video Two, 0:31, and the parties do not dispute that multiple vehicles were present during the encounter. See Doc. #39 at 4; Doc. #43 at 2 n.1.

believe that additional measures were necessary to ensure the
safety of the officers and the public. The detention's public
setting thus weighs in favor of finding that the officers'
actions were "the least intrusive means reasonably available to
effect their legitimate investigative purposes." Fiseku, 915
F.3d at 870 (citation and quotation marks omitted).

### C.   Number of Officers

The number of officers present throughout the encounter is
not sufficient to suggest that this Terry stop was converted
into a de facto arrest. Throughout the time Walker was detained,
but not yet formally arrested, four officers interacted with
three potential suspects. This "police presence, far from
conveying intimidation, was arguably the minimum necessary to
realistically maintain control of the situation." Fiseku, 2015
WL 7871038, at *8. Indeed, when defendant resisted the officers'
attempts to handcuff him, all four officers were forced to focus
their attention on Walker in order to control him. See Video
Two, 2:02-2:15. As a result, the other two subjects were left
unattended at a time when a suspected firearm had not yet been
located. See id. "This situation created a risk that one or more
subjects might attempt to take an officer by surprise, including
by attempting to ... access a weapon[.]" Fiseku, 2015 WL
7871038, at *8.

In light of this danger, the presence of four officers was

"the least intrusive means reasonably available" to ensure officer and public safety. Fiseku, 915 F.3d at 870 (citation and quotation marks omitted); see also Newton, 369 F.3d at 675 (rejecting argument that involvement of six officers in Terry stop of single suspect threatening to kill mother supported finding of de facto arrest). Accordingly, this factor weighs in favor of finding that the Terry stop did not ripen into a de facto arrest before the officers developed probable cause.

D.   **The Risk of Danger and Use of Force**

Finally, the risk of danger posed by defendant and the officers' use of force both weigh in favor of finding that a de facto arrest did not occur before the officers developed probable cause to arrest the defendant. While the risk of danger and use of force are independent factors, they are necessarily intertwined. Accordingly, the Court considers these factors together.

Defendant asserts that the officers' decisions to order him out of the vehicle and attempt to handcuff him "collectively amount to an arrest for which probable cause was lacking." Doc. #39 at 3. The government responds that "[a]ttempting to put handcuffs on the defendant in response to him reaching back into the car after having been removed from it did not amount to an arrest." Doc. #43 at 9 (emphases omitted).

"[A]lthough under ordinary circumstances, drawing weapons

and using handcuffs are not part of a Terry stop[,] intrusive
and aggressive police conduct is not an arrest when it is a
reasonable response to legitimate safety concerns on the part of
the investigating officers." United States v. Vargas, 369 F.3d
98, 102 (2d Cir. 2004) (citation and quotation marks omitted).
Handcuffing does not transform a Terry stop into an arrest when
the "police have a reasonable basis to think that the person
detained poses a present physical threat and that handcuffing is
the least intrusive means to protect against that threat."
Fiseku, 915 F.3d at 871-72 (citation and quotation marks
omitted).

     1.   Present Physical Threat

    The officers had a reasonable basis to believe that
defendant posed a present physical threat to their safety.

    As an initial matter, the nature of the investigation
weighs in favor of finding that there was a present physical
threat when the officers attempted to handcuff the defendant.
The officers received information from a confidential source
indicating that "a tall, light skinned black male ... had a gun
and drugs in his possession in a vehicle." Doc. #39-1 at 3.
"'Narcotics activity and weapons often go hand in hand, and the
type of investigative detention at issue here is fraught with
danger for the officer.'" United States v. Hamilton, No.
20CR00545(PMH), 2022 WL 1157382, at *6 (S.D.N.Y. Apr. 19, 2022)

(quoting United States v. Santillan, 902 F.3d 49, 59 (2d Cir.
2018)). Consistent with this principle, the Second Circuit has
"found that officers acted reasonably in using handcuffs when
they acted based on reliable information that a suspect was
armed and possibly dangerous." Fiseku, 915 F.3d at 872.
Furthermore, courts within this Circuit have held that where
"the agents suspected that they were interrupting a narcotics
transaction, the agents had safety concerns sufficient to
warrant placing handcuffs on the defendant." United States v.
Jenkins, No. 5:14CR00114(GWC), 2015 WL 1467691, at *9 (D. Vt.
Mar. 30, 2015), aff'd, 659 F. App'x 1 (2d Cir. 2016); see also
Rivera, 2008 WL 2229917, at *6 ("[T]he Second Circuit has
repeatedly acknowledged the dangerous nature of the drug trade
and the genuine need of law enforcement agents to protect
themselves from the deadly threat it may pose." (citation and
quotation marks omitted)). Consequently, the nature of the
investigation weighs in favor of finding that the officers had a
reasonable basis to believe that the defendant posed a present
physical threat to their safety.

The defendant's conduct during the encounter supports this
finding. The defendant did not resist when he was instructed to
exit the vehicle. See Doc. #39-1 at 3. However, upon exiting the
vehicle, Walker "reached back into the vehicle as if he was
trying to retrieve something[.]" Id. At that time, the officers

had not yet located the suspected weapon. It was thus reasonable for the officers to believe that the defendant's attempt "to reach for something in the car[]" posed a threat of present harm. Patterson, 25 F.4th at 146; see also Torres-Miranda, 2021 WL 77096, at *9 ("The U.S. Supreme Court has expressly recognized that suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed." (citation and quotation marks omitted)).

To rebut this argument, defendant contends in his briefing that he "appeared to lean towards the back seat of the car where he was standing in order to put down [his] cell phone." Doc. #39 at 2.[5] However, the video submitted by the parties contradicts this. Defendant was holding a phone, but when he attempted to reach back into the vehicle, he clearly stated, "can I get my phone, can I get my phone please?" Video Two, 1:21-1:28 (emphasis added). In other words, defendant expressed to the officers that he was trying to retrieve something, not put something down. In light of this conduct, the officers were not required to assume that defendant's movements "had an innocent explanation[.]" Patterson, 25 F.4th at 146. Defendant's decision to reach back into the car -- at a time when a suspected weapon had not yet been located -- provided the officers with a further

_____

[5] Defendant does not make this claim in an affidavit or other sworn testimony, but only in argument by counsel.

basis to believe that defendant posed a present threat to their safety.

Taken together, the nature of the investigation, the information already known to the officers, and defendant's conduct, provided the officers "with a reasonable basis to think that the [defendant] pose[d] a present physical threat." Fiseku, 915 F.3d at 871 (citation and quotation marks omitted). That threat was sufficient to justify the attempted use of handcuffs.

      2.   Least Intrusive Means

Furthermore, the officers had a reasonable basis to believe that handcuffing the defendant was the least intrusive means to ensure the safety of the officers and the public.

> [A] creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

Bailey, 743 F.3d at 340 (quoting Sharpe, 470 U.S. at 686-87).

The Court finds that the officers did not unreasonably fail to recognize or pursue a less intrusive alternative than handcuffing in this instance. Despite being informed by a reliable source that a person matching the description of the defendant "had a gun[,]" Doc. #39-1 at 3, the officers "did not

draw their weapons." <u>Fiseku</u>, 2015 WL 7871038, at *8. Instead, they approached the vehicle with their weapons holstered, before directing the occupants, including Walker, to exit the vehicle. When the officers attempted to handcuff Walker, the suspected firearm had not been located. "Under these circumstances, handcuffing was a less intimidating -- and less dangerous -- means of ensuring officer safety than holding [defendant] at gunpoint." <u>Fiseku</u>, 915 F.3d at 873 (citation and quotation marks omitted).

Indeed, when confronted with a quickly developing situation, and unaware of whether defendant "might have access to a weapon[,]" the officers "made the cautious choice" to attempt to restrain him with handcuffs. <u>Id.</u> This Court will not "indulge in unrealistic second-guessing[]" of the officers' conduct. <u>Id.</u> (citation and quotation marks omitted). Where, as here, the officers had a reasonable belief that the defendant possessed a weapon, and the defendant reached toward the vehicle he was directed to exit, the officers' "decision to handcuff Defendant ... was a cautious reasonable measure to prevent Defendant from accessing the object that he secreted." <u>Torres-Miranda</u>, 2021 WL 77096, at *9. Thus, the Court finds that the officers had a reasonable basis to believe that handcuffing the defendant was the least intrusive means to prevent a present threat to their safety. The risk of danger posed by the

defendant in the circumstances weighs in favor of finding that the <u>Terry</u> stop was not transformed into a <u>de facto</u> arrest when the officers instructed defendant to exit the vehicle and attempted to handcuff him, and the officers' use of handcuffs was reasonable under the circumstances.

In sum, defendant has conceded that the officers had the reasonable suspicion required to conduct a <u>Terry</u> stop. Because the duration of the <u>Terry</u> stop was brief, occurred in a public setting, involved relatively few officers, and was effectuated using the least intrusive means available to ensure officer and public safety, the <u>Terry</u> stop did not ripen into a <u>de facto</u> arrest when the officers instructed defendant to exit the vehicle and attempted to handcuff him.

Defendant has thus failed to establish that the officers violated his Fourth Amendment rights. Accordingly, defendant's Motion to Suppress Physical Evidence (Doc. #38) is **DENIED.**

## IV.  <u>Conclusion</u>

Thus, for the reasons stated, defendant's Motion to Suppress Physical Evidence [**Doc. #38**] is **DENIED.**

It is so ordered at Bridgeport, Connecticut, this 17th day of June, 2022.

/s/ _____
HON. SARAH A. L. MERRIAM
UNITED STATES DISTRICT JUDGE
